**David P. BLAIR**

v.

**UNITED STATES STEEL
CORPORATION.**

No. 67–1363.

United States District Court,
W. D. Pennsylvania.

May 1, 1970.

Paul E. Moses, Evans, Ivory & Evans, Pittsburgh, Pa., for plaintiff.

Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for defendant.

## OPINION

GOURLEY, Senior Judge.

This is an admiralty action brought by plaintiff to recover damages for personal injuries allegedly sustained by him while working on a vessel in the course of his employment as a stevedore or barge-loader for the defendant. A sole cause of action is asserted under the maritime doctrine of seaworthiness. Following the completion of pre-trial proceedings, a non-jury trial was conducted by this member of the Court. The testimony has been completed, the transcript filed, and proposed findings of fact and conclusions of law have been submitted by counsel for the respective parties. Based upon the complete record, I am of the opinion that judgment must be awarded in favor of plaintiff and against defendant. In support thereof, the Court sets forth the following:

### FINDINGS OF FACT

#### Jurisdiction and Liability

1. Plaintiff was first employed by defendant at its National Tube Works in McKeesport, Pennsylvania, on December 29, 1964, as a pipe loader in the shipping department. Prior to February 7, 1967, his work had always been performed in the plant or surrounding area, on the land or on railroad cars. Before the date of his accident he had never worked on a barge.

2. On February 7, 1967 and February 8, 1967, defendant assigned plaintiff to assist in loading pipe in barges moored in the Monongahela River at the defendant's barge-loading area. On each of said dates plaintiff was engaged in barge-loading work between the hours from 3 P.M. to 11 P.M.

3. The Monongahela River is a navigable waterway of the United States.

4. The barges on which plaintiff worked on both dates were designated as MBL 810, OBL 388 and OBL 465. Of these only MBL 810 was a jumbo (large sized) covered (having movable lids) type barge.

5. Plaintiff's accident occurred during the performance of barge work on February 7, 1967. It was cold and after dark when the events took place which are the subject of this litigation. The barge being loaded at the time was a jumbo covered barge designated as MBL 810.

6. The work of loading the barge was accomplished with the aid of defendant's locomotive crane which was stationed on the dock and the boom of which had attached to it a cable and sling for carrying pipe. Defendant's crane operator would lift a load of pipe from railroad cars brought to the dock area, transport the load over the dock area and lower it into the barge. On an average, the crane carried a load of about ten tons. The distance from the top of the dock to the bottom of the barge was approximately twenty-five feet.

7. The plaintiff was one of a crew of four pipe loaders, the duties of which were to receive the pipe as lowered from the dock to the barge, unhook the slings, roll the pipe into place, place spacers, secure the cargo and perform other miscellaneous functions in order to accomplish the loading of pipe in the barge.

8. In order to perform his duties, it was necessary for the plaintiff to be in the bottom of the barge. It was neither

feasible nor possible for him to leave the bottom of the barge during the time a lift was being made, there being no means of egress afforded.

9. Plaintiff had never been instructed concerning barge loading operations and was unfamiliar with the procedures followed or events that could be expected to arise during loading.

10. The pipe was being loaded in the barge in several tiers. Plaintiff was working on top of the first tier of pipe along with Harrison and Hamar. Fani was laying bearing strips in the second tier in which there was some pipe.

11. Between the tiers was an open space.

12. The distance from the top of the tier of pipe upon which plaintiff was standing to the floor of the barge between the two tiers of pipe was six to eight feet.

13. On the floor of the barge in the space between the tiers there was an accumulation of ice six or eight feet long and four feet wide, or at least four feet in diameter.

14. Although one of the fellow employees had discovered said icy condition plaintiff had not been told about said condition nor had he noticed or seen the same. This was unquestionably due to the poor and insufficient lighting in the loading area and more particularly on the barge vessel.

15. The lighting was such that various areas of the barge were in shadow or darkness. Although there were lights on the dock wall and upon poles situated on the dock, there were no lights on the barge for illuminating the work area. Portable or artificial lights were not placed or temporarily installed on said barge or any other barges being loaded. In fact, it was the defendant's practice not to do so in any barge being loaded.

16. The accident occurred as a sling loaded with pipe was being lowered into the barge. As the lift was brought down, a swing began to develop. The lift banged or struck the edge of the barge, then contacted or was brought up against the wall of the dock, and then started down into the barge.

17. Harrison, who had fourteen years experience and was working with plaintiff on top of the tier, thinking that the lift might "get away", ran to the outside corner of the barge where he knew he would be out of reach of a swinging lift. Hamar also went to this location.

18. Plaintiff, fearing that the load would break loose and fall upon him, jumped from the tier of pipe on which he was standing to the floor of the barge and landed on the accumulation of ice which was in the area between the tiers. He slipped, landing in a sitting position and his head jerked back. As a result, he was injured.

19. Although it was customary for a locomotive-crane operator, on occasion, to check the swing in a lowered lift by bringing the lift gently against the barge wall, plaintiff, inexperienced and uninstructed in barge operations, honestly believed he was involved in a sudden emergency as a result of the course of the swinging lift, both before and after it struck the barge wall. Plaintiff was never told, informed or advised of said custom. The sudden emergency in which the plaintiff became involved was not the result of his own neglect or lack of care in any way whatsoever.

20. The ownership of the barge vessel has not been firmly established, although it appears certain that it was not owned by defendant at the time of the accident. This fact is immaterial, in my considered judgment. It matters not whether the defendant was the owner, charterer, lessee or bailee of the barge vessel or whether defendant had a right of possession on an hourly, daily, yearly or monthly basis. Since the barge vessel was in the sole and absolute control of the defendant, liability for the unseaworthy condition must exist against said defendant.

21. At and prior to the time of the accident, the barge in question was one of a group of barges at the defendant's

plant. It was one of five barges moored in the loading area.

22. The barges are customarily delivered to the defendant by river boat companies. They may be tied up either by a river boat company crew or by defendant's own crew of barge handlers. After the barges are tied up, a river boat company's crew leaves.

23. The defendant's barge handlers have different duties than the barge loaders and are directed by defendant's supervisors. Their duties include moving the barges. Defendant's barge shipper has the responsibility of directing the placement of the barges for loading at appropriate times. To accomplish this purpose he contacts the supervisor of the crew of barge handlers who are then charged with the duty of moving the barges from a given location within the river loading area where they may be moored to the specific location adjacent to the dock where they may be loaded. This movement is accomplished with the use of pulleys, drawn upon manually or by locomotive crane, but without the use of motor-powered vessels.

24. Defendant's barge handlers are responsible for the maintenance of the barges themselves to the extent that they have duties of pumping out the barges with a steam pump if they are found to be accumulating water and of placing red navigational warning lights upon the barges.

### Damages

25. The medical testimony is most substantially disputed as to the injuries sustained, the present condition of plaintiff, and his ability to pursue regular and steady employment in the type or class of work for which he is mentally and physically qualified and experienced.

26. Although over a period of years plaintiff had been involved in some motor vehicle accidents, he sustained no substantial injury in any of them, had never sustained any injury to his neck or back and was in excellent health prior to the accident.

27. While plaintiff reported the accident belatedly to his superiors, the accident was known to plaintiff's fellow bargeloaders. A more prompt report of the accident could not have been expected because plaintiff's initial symptoms and pain were not localized in the specific areas in fact injured, and a causal connection between the accident and injury was not discovered by plaintiff until later.

28. Plaintiff's work record prior to the accident was good, he being a willing and cooperative worker at all times.

29. As a result of the accident, plaintiff sustained an injury to the neck for which he has received medical treatment to date, principally from the following doctors: Dr. C. Ramaswamy, Dr. Patrick G. Laing, Dr. James Rosen and Dr. Ruber Tenicella.

30. Dr. Ramaswamy first saw plaintiff on February 20, 1967. Dr. Ramaswamy immediately prescribed cervical traction and thereafter caused the plaintiff to be admitted to the Charleroi-Monessen Hospital on two occasions with a diagnosis of herniated cervical disc. During the first hospitalization plaintiff was treated with cervical traction, medication and physiotherapy. During the second hospitalization, his neck pain having grown worse, he had further conservative therapy followed by surgery during which a herniated disc at the level of C6 and C7 disc space was removed by anterior surgery. A fusion graft was obtained from the hip region and applied to the area of disc removal. He was followed by Dr. Ramaswamy after his discharge from the hospital, having continuing complaints of pain in the left shoulder, arm and fingers which were not relieved.

31. Dr. Ramaswamy received a belated history of plaintiff's accident but was definitely positive that Mr. Blair's problem was secondary to the injury and that his condition was caused by the accident.

32. Plaintiff next came under the care of Dr. Laing, another orthopedic

surgeon, on October 30, 1967. He caused Mr. Blair to be hospitalized also on two occasions at Presbyterian-University Hospital, on the first of which a manipulation of the cervical spine was performed and other procedures, such as traction and physiotherapy, administered. This was done to alleviate plaintiff's pain in his neck, shoulders and left chest. When improvement was not maintained, he was again hospitalized for further studies and physiotherapy and a Mayo-type cervical collar was prescribed. The diagnosis made by Dr. Laing was cervical degeneration with nerve root pressure. In his opinion, also, this condition was caused by the accident and is not relievable by further operations or other procedures.

33. Dr. James Rosen, a neurologist, also attempted to treat plaintiff for his continued posterior cervical pain, left upper extremity and chest. He caused plaintiff to be re-hospitalized for further studies, including a myelogram, and subsequently arranged for the plaintiff to undergo various nerve blocking procedures performed by Dr. Tenicella. In his opinion, plaintiff's condition was caused by the trauma of the accident and was diagnosed as chronic post-traumatic syndrome with cervical fibromyositis. In spite of the nerve blocks, plaintiff's painful condition has not been relieved, the nerve blocks administered having afforded Mr. Blair only temporary relief.

34. Although continued nerve blocks hold out some slim prospect of relief, they are attended with grave risk of paralysis or death and are not recommended at least without very extensive supportive measures.

35. Plaintiff's condition is permanent.

36. As a result of the fusion operation, plaintiff's ability to turn his head is limited on either side to the extent of fifteen or twenty degrees.

37. Because of his injuries, plaintiff is permanently incapacitated from performing heavy work. Because of the pain he now experiences, he is also unable to engage in any sustained kind of physical activity even of a light nature which involves physical exertion.

38. By reason of his residual disability and/or the performance of surgery as revealed by the presence of a cervical scar, it will be difficult for plaintiff to secure a job.

39. Plaintiff had completed only eight grades of formal education. His entire work history prior to his employment by defendant had involved work of heavy nature such as laborer, gas station attendant, truck driver, factory worker, steel hauler, construction worker and cattle hauler.

40. Since the accident his activities have been limited to doing work around his yard and house cleaning. He attempts to work and can only do so for a short period of time before developing pain and stiffness which require him to stop. The pain he experiences is constant and often keeps him awake at night.

41. Plaintiff experienced extreme pain before, during and following his five hospitalizations and the administration of various procedures such as myelogram and nerve blocks. His pain has been on a regularly recurring basis from the date of the accident to the present and will continue in the future.

42. Because of his injuries, plaintiff lost work from February 18, 1967 and has been continually unable to work thereafter. As of the date on which the trial was completed, November 7, 1969, he had been absent from work two years and approximately eight and one-half months. The plaintiff's hourly rate as a pipe loader at the time of the accident was $2.604 per hour. In the year immediately preceding the accident (from pay period ending January 8, 1966 to pay period ending January 7, 1967) he had earned, according to the defendant's records, $5,465, an average of $455 per month. On such basis, his wage loss as of November 7, 1969, the date of comple-

tion of the trial, was approximately $14,597.

43. By reason of his long absence from his work, his service with the defendant has been terminated because of agreements governing employees between the company and the union. In order to be re-employed by United States Steel Corporation, he would have to submit an application as a new employee and pass a physical examination. He would not be employed by defendant.

44. The plaintiff was born on February 3, 1931. He was thirty-eight years old at the time of trial, having, according to Life Tables published by the United States Department of Health, Education and Welfare, an expectancy of 33.4 years. Plaintiff's retirement from defendant's service was mandatory at age seventy, although after age sixty-five continued employment was subject to his passing semi-annual physical examinations. His work life expectancy was thus thirty-two years. Plaintiff's proved earning capacity was $5,465 per annum and on that basis his gross future earnings, except for his disability, would be $174,880. The present worth of $5,465 per annum for thirty-two years at a discount rate of five and one-half percent is $81,451.45 *.

45. Plaintiff incurred extensive bills in connection with the rendition of necessary medical and surgical treatment for his injuries and for numerous hospitalizations in the total sum of $5,188.84. The aforementioned bills were directly related to the plaintiff's injuries and all were established by proper evidence as being necessary to further the plaintiff's recovery and were reasonable in amount.

## CONCLUSIONS OF LAW

### Jurisdiction and Liability

1. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1333.

■ 2. Barge MBL 810, although without motor power of its own, was a vessel within the meaning of the Maritime Laws of the United States. Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1943).

■ 3. Unseaworthiness is created where a given condition temporarily renders the vessel, its equipment and appurtenances, unseaworthy, and no valid distinction is to be drawn between operational negligence and unseaworthiness. Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967); Candiano v. Moore-McCormack Lines, Inc., 382 F.2d 961 (2d Cir. 1967), cert. den., 390 U.S. 1027, 88 S.Ct. 1416, 20 L. Ed.2d 284 (1968); Alexander v. Bethlehem Steel Corporation, 382 F.2d 963 (2d Cir. 1967), cert. den., International Terminal Operating Co. v. Alexander, 393 U.S. 1064, 89 S.Ct. 717, 21 L.Ed.2d 707 (1969).

■ 4. The duty to provide a seaworthy vessel includes a duty to provide both seamen and longshoremen with a safe place to work and this obligation extends to stowage where men perform loading and unloading. Venable v. A/S Det Forenede Dampskibsselskab, 399 F. 2d 347 (4th Cir. 1968).

■ 5. On February 7, 1967, plaintiff suffered an accident and injury which were caused by the following conditions, each of which rendered the vessel unseaworthy:

(a) An accumulation of ice on the floor of the barge in the area between the tiers on one of which the plaintiff was working;

(b) The absence of lights upon the barge itself which were necessary in order to illuminate the entire area and which would have eliminated areas of darkness in which it was likely that dangerous icy and slippery conditions would exist. The need for such additional lighting on the barge itself was increased due to insufficient lighting emanating from the dock and because, under defendant's practices, no effort

* Factor 14.9042 taken from Present Value Tables published by Lawyers and Judges Publishing Co., Inc., Copyright 1968).

was made to eliminate ice from the interior of the barge.

6. The barge vessel on which the plaintiff sustained his injuries was not owned by the defendant. It was, however, in the exclusive control and possession and under the direction of said defendant. Regardless of the basis for its possession, the defendant is responsible for its unseaworthy condition and for the injuries and damages arising from said lack of seaworthiness.

7. By virtue of performing functions of moving barge MBL 810 and others within the dock area, pumping the barges when excess water accumulated, and maintaining navigational lights upon said barges, defendant exercised a possession and control of said vessels exceeding that delegated to a mere bailee and acquired an operational and navigational interest in said vessels. Watson v. Gulf Stevedore Corporation, 374 F.2d 946 (5th Cir. 1967), cert. den., 389 U.S. 927, 88 S.Ct. 286, 19 L.Ed.2d 277 (1967); Petition of Shaver Transportation Company, 287 F.Supp. 339 (D. Oregon 1967); Mach v. Pennsylvania R. Co., 207 F.Supp, 233 (D.C. Pa. 1962), aff'd 317 F.2d 761 (3d Cir. 1963).

8. In view of the defendant's possession, control and use of the unseaworthy barge vessel, it had an operational and navigational interest therein. Since the plaintiff was performing navigational and operational as well as stevedoring functions, it is liable to plaintiff in damages for unseaworthiness under the decision of the Supreme Court of the United States in Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448.

### Damages

9. According to the weight of the medical testimony, plaintiff must be considered to have a disability which is partial and permanent, precluding plaintiff from both heavy and most light physical work. His economic horizon is most limited in the competitive industrial market.

10. The plaintiff has incurred great medical and hospital expenses, has lost substantial wages, has a substantial permanent partial disability, and has, is and will continue to experience throughout the span of his life most grievous and nerve racking pain, suffering and inconvenience which is substantially aggravated on sustained physical effort and application of the use of the physical functions of his body.

### DISCUSSION

The law is settled that the owner of a vessel or bareboat charterer is responsible in damages for unseaworthiness to an employee-longshoreman who is injured while engaged in loading a vessel on behalf of said owner or charterer. Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1962).

It is also well recognized that a ship owner's warranty of seaworthiness extends to a longshoreman while loading a vessel even where employed by an independent contractor. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

In determining whether to extend the doctrine heretofore enunciated to the facts in this case, the Court has considered what must be brought to the forefront at all times—the humanitarian policy of the doctrine of seaworthiness.

Consideration must be given to the hazards of marine service, the helplessness of the men to learn or know of, and ward off, the perils of unseaworthiness, especially in the night time and when sudden emergencies arise during the performance of their duties and the furtherance of the business interests of their employer.

It must also be remembered that the doctrine of seaworthiness cannot be held to depend upon any kind of contract between the owner of the vessel or barge. I believe that the person, individual or corporation who has not only a bailee's custody but also operational and navigational control of a vessel is subject to the doctrine of seaworthiness.

This should be true regardless of the formal contractual relationship which exists between the owner of the vessel and the person having the aforementioned degree of control when a person working on the vessel is involved in an accident and injured.

The plaintiff in this proceeding, who was an employee of the defendant and was injured while working on a barge, cannot be denied the traditional and basic protection of the warranty of seaworthiness because the defendant, U. S. Steel Corporation, was not the owner or charterer of the vessel.

I, therefore, conclude that the defendant, which had the operational and navigational control over, as well as the possession, custody, use and management of the barge, is subject to and responsible under the seaworthiness doctrine.

To find otherwise would be to permit the remedial effects of the doctrine of seaworthiness to be limited or escaped by formalistic contracts, agreements, arrangements and understandings. This cannot be permitted, since the duty to provide a seaworthy vessel is rooted, not in contracts, but in the hazards of the work of the person required to go upon the vessel to perform duties and pursue his employment at all times of the day and night and varying conditions and circumstances. All such persons are subject to the same dangers and are entitled to like treatment under the law regardless of what the business relationship might be between an owner of a barge and a person who has operational and navigational control of said vessel. A person injured on a vessel should not be placed in a position where he is playing "Russian roulette", so to speak, as to what the relationship might be between the owner of the vessel and his employer at the time the employee is involved in an accident and injured.

Under the Federal Employers' Liability Act, a railroad using equipment which is defective is responsible for injuries sustained by its employees regardless of the ownership of said equipment by a third person where it is defective and not suitable or fit for the purposes intended. Shenker v. Baltimore & Ohio R. Co., 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1962). I fail to see or find any reason why the same rule of law should not be applied or exist where a person is injured on a vessel which is in navigation on the inland waterways, that is at dock side for the purpose of being loaded, where an accident occurs and injuries are sustained as a direct result of the unseaworthy condition of said barge vessel.

It is therefore concluded that the employee of the defendant corporation is entitled to the application of the doctrine of seaworthiness to his employer.

### ORDER

NOW, this 1st day of May, 1970, it is hereby ORDERED that judgment be entered in favor of plaintiff and against defendant in the total sum of $95,000, in compensation for plaintiff's medical and hospital expenses, past wage loss, pain and suffering, and loss of earning power resulting from a permanent partial disability.